# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :
             : CRIMINAL ACTION
    vs.       :
             :  NO. 07-CR-549-1
MAURICE PHILLIPS      :


## MEMORANDUM AND ORDER

**JOYNER, J.**             **June  8, 2021**


   The instant criminal action is presently before this Court for adjudication of the Motion filed *pro se* by Defendant Maurice Phillips to Vacate, Set Aside or Correct his sentence pursuant to 28 U.S.C. § 2255.  The Government quite naturally opposes the relief sought and for the reasons discussed below, the motion (as amended) shall be denied.

## History of the Case

   The motion now before the Court has its genesis in Defendant's 2010 convictions for a long list of serious and heinous crimes[1] which were committed over a period of nearly ten

---

[1] Specifically, Defendant was charged and ultimately convicted of the following crimes following a nearly five-month long trial before the undersigned: murder and tampering with a witness, victim, or informant in violation of 18 U.S.C. §§ 1111(a), 1512(a)(1)(C), (a)(3)(A) and aiding and abetting the same in violation of 18 U.S.C. § 2; use of interstate commerce facilities in commission of a murder for hire, as proscribed by 18 U.S.C. §1958; concealment of and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) and aiding and abetting; engaging in a criminal enterprise in violation of 21 U.S.C. § 848(b) and (c); and conspiracy to distribute more than 5 kilograms of cocaine under 21 U.S.C.

1

years in the course of his having organized and run a large-scale cocaine distribution network known as the Phillips Cocaine Organization or "PCO."

The PCO operated primarily in the metropolitan areas of Philadelphia, Newark, New Jersey, New York, Washington, D.C., Virginia, and Maryland from approximately 1998 until Defendant's arrest in 2007.  In the course of his operation of the PCO, Maurice Phillips sold and/or distributed thousands of kilos of cocaine worth tens of millions of dollars, making himself a multi-millionaire in the process.

Because of the large volumes of money which Defendant was acquiring, he required the services of a professional money-launderer to facilitate his purchases of legitimate assets, including real estate and high-end motor vehicles, among others. In late 1998, Defendant was introduced to Chineta Glanville, a professional money launderer, by one of his girlfriends and co-defendants in this action, Chanelle Cunningham.  Shortly thereafter, Defendant began using Glanville's services to launder the proceeds of his drug business for himself, Cunningham and two other co-defendants, Lamont and Feanna Smith. Glanville accomplished this objective by, *inter alia*, creating

---

§846.  Although the Government sought the death penalty for these crimes, following the sentencing phase of Defendant's trial, the jury determined that he should be spared death and sentenced instead to life imprisonment without the possibility of release.

shell corporations and businesses, bank accounts and fake identification, employment documents and income tax records. Over time, Glanville facilitated Phillips' purchase of a number of residences, businesses, and vehicles, as well as at least one apartment building, trash trucks for a trash hauling business and a high-end clothing boutique in the Atlanta, GA area. Phillips also enjoyed a lavish lifestyle, spending vast sums of money in hosting large parties and weddings, travelling and renting box seats at sporting events, among other activities.

In or around May 2002, agents served search warrants on the homes of Feanna and Lamont Smith and Chinetta Glanville, in the course of which they uncovered and seized, among other things, computers, business records, some $61,000 in cash, and falsified income tax returns prepared by Glanville. Glanville immediately began cooperating with law enforcement authorities and apparently advised Feanna Smith of her cooperation and that she, the Smiths, Phillips and Cunningham were all going to jail. This information was relayed to Defendant and he promptly began planning to have Glanville murdered in order to silence her. Phillips reached out to his cousin, Bryant Phillips, who had recently been released from federal prison after serving a lengthy sentence for bank robbery and was then living in Nashville, TN. Eventually, Defendant reached an agreement with his cousin to kill Glanville in exchange for $18,000.

On June 22, 2002, Defendant wire-transferred $300 to Bryant Phillips under someone else's name to cover the expenses for Bryant's trip from Tennessee to the Philadelphia area. Two days later, Bryant Phillips drove north in his girlfriend's car to Defendant's home in Roselle/Linden, New Jersey. From there, he and Defendant travelled to the Montgomery County, Pennsylvania suburb where Glanville lived and Defendant showed him around the area, including a nearby supermarket and post office parking lot where Defendant told his cousin he should park so he could walk to Glanville's residence.  On the trip back to Defendant's home, Defendant stopped at a Federal Express facility in Kenilworth, NJ where Defendant met with an associate who was employed there, later identified as Reginald Smith, ostensibly to pick up a gun. When Defendant returned to the car, he was upset that Smith had not given him a gun but the following morning, Defendant gave his cousin a Federal Express uniform and envelope along with a firearm.  Giving him a description of what Glanville looked like, Defendant told Bryant Phillips that Glanville's garage door would be open if she was at home and that he wanted him to kill her at 10 a.m., as he had arranged to have an alibi at that time.

Bryant Phillips did as he was told and drove to the supermarket parking lot shortly before 10 a.m. on June 25, 2002, parked and walked the few blocks to Glanville's house wearing

sunglasses and the Federal Express Uniform. Walking into the open garage, Bryant Phillips knocked on the door leading to the interior of the house and it was answered by one Dane King, Glanville's adult godson, who was visiting. He told King that he had a package that he needed to deliver personally to Glanville and King led him down the hallway to Glanville. At that point, Bryant Phillips removed a semi-automatic handgun from beneath his uniform shirt, ordered Glanville to lie on the floor and fired two bullets into the back of her head, killing her. King responded by kicking Phillips in the knee and Phillips emptied the clip of the handgun into King, also killing him. Bryant Phillips then fled the house and drove straight back to Tennessee, disassembling the gun along the way and throwing the parts away at various places along the highways. Defendant had arranged for an associate to meet his cousin at a mall parking lot in Baltimore, MD where he was paid $16,000 in cash for the killings of Glanville and King. Defendant paid the remaining balance of $2,000 to Bryant Phillips by allowing him to take whatever goods he wanted from Defendant's Atlanta, GA clothing boutique.

A little over a year later, Bryant Phillips was arrested in Nashville for statutory rape but, hearing the approaching deputies, he attempted to throw a firearm out of a bedroom window. He was subsequently charged in federal court for the

firearm offense and Defendant provided $25,000 for his legal
fees through Chanel Cunningham.  In a visit from Defendant while
Bryant Phillips was incarcerated at a Memphis prison, Bryant
suggested that he could provide information about one of
Defendant's rival drug dealers to obtain a more favorable prison
sentence.  Defendant, however, rejected this idea and over time,
Bryant had more and more difficulty in communicating with his
cousin.  Becoming more and more uneasy and fearful that
Defendant might tell someone else or the authorities that Bryant
had murdered Glanville and King, Bryant Phillips contacted his
attorney with the request that he set up a meeting with
prosecutors.  In a subsequent series of proffer sessions, Bryant
Phillips informed law enforcement about his and Defendant's
involvement in the Glanville/King murders, eventually entering
into a negotiated plea agreement whereby he agreed to plead
guilty to committing them and to giving testimony against
Defendant.  Chanel Cunningham and Feana Smith thereafter also
began cooperating and agreed to testify against Defendant as
well.

On September 12, 2007 Defendant, along with ten others, was
charged in a multi-count grand jury indictment, with, *inter
alia*, the charges of which he was eventually convicted.[2]  He was

---

[2] A superceding indictment was filed on January 23, 2008 which added two more
defendants.  Subsequently, all but two of Phillips' co-defendants pled
guilty, several of whom testified against him at trial.

arrested the following day and held without bail pending trial which did not begin until January 3, 2010. As outlined above, Defendant was convicted of all of the multiple counts against him, including murder and tampering with a witness, victim, or informant in violation of 18 U.S.C. § 1111(a), 1512(a)(1)(C), (a)(3)(A) and aiding and abetting the same in violation of 18 U.S.C. § 2; use of interstate commerce facilities in commission of a murder for hire, (18 U.S.C. § 1958); concealment of and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) and aiding and abetting; engaging in a criminal enterprise in violation of 21 U.S.C. §§ 848(b) and (c); and conspiracy to distribute more than 5 kilograms of cocaine under 21 U.S.C. § 846. The penalty phase of the trial commenced on April 19, 2010. It lasted for more than a week, until April 28, 2010, at which time the jury determined to spare Defendant's life and that he should be sentenced to multiple terms of life imprisonment without the possibility of release. On appeal, the Third Circuit determined that, while the Court had erred in failing to give the jury a unanimity instruction on the Continuing Criminal Enterprise charge, it would be in the interests of judicial economy and efficiency to dismiss the conviction on that offense and the remainder of the judgments of conviction and sentences were affirmed. See, United States v. Phillips, No. 10-3706, 589 Fed. Appx. 64, 2014 U.S. App. LEXIS

7

19795 (3d Cir. Oct. 16, 2014).  Although Defendant filed a

petition for writ of certiorari to the U.S. Supreme Court, that

petition was denied on June 29, 2015.  United States v.

Phillips, 576 U.S. 1064, 134 S. Ct. 2911, 192 L. Ed.2d 941

(2015).  Almost exactly one year later, Defendant filed, *pro se*,

this motion to vacate, correct and/or set aside his sentence

pursuant to 28 U.S.C. § 2255.[3]

## Standards Governing Section 2255 Motions

Section 2255 is the federal counterpart to 28 U.S.C. § 2254

governing the filing of petitions for habeas corpus relief from

custody pursuant to judgments of State courts. See, United

States v. Vancol, 778 F. Supp. 219, 222, n.7 (D. Del.

1991)(noting that a proceeding which "is brought under 28 U.S.C.

Section 2255 is the statutory analogue of habeas corpus for

persons in federal custody").  The Supreme Court has observed

that the § 2255 statute "was intended to alleviate the burden of

habeas corpus petitions filed by federal prisoners in the

district of confinement, by providing an equally broad remedy in

the more convenient jurisdiction of the sentencing court."

United States v. Addonizio, 442 U.S. 178, 185, 99 S. Ct. 2235,

---

[3] Although the docket in this matter reflects that this motion was filed on
July 5, 2016, as the Government has acknowledged in its responsive briefing,
Defendant signed and presumably placed the motion into the prison mail system
one day before the 1-year limitation period for doing so expired - on June
28, 2016. It is therefore deemed to have been timely filed.

2240, 60 L. Ed.2d 805 (1979)(citing United States v. Hayman, 342

U.S. 205, 216-217, 72 S. Ct. 263, 96 L. Ed. 232 (1952)).

Indeed, it has been said that "[t]he purpose of § 2255 was to

require a Federal prisoner to exhaust his remedies in the courts

of the District and Circuit in which he was convicted and

sentenced, and to apply to the Supreme Court, on Certiorari from

a denial of such remedies, before seeking a release on habeas

corpus." Kikumura v. United States, 978 F. Supp. 563, 573-574

(D.N.J. 1997)(quoting Crismond v. Blackwell, 333 F.2d 374, 377

(3d Cir. 1964)).

Thus, § 2255 is a vehicle by which persons in custody

pursuant to sentences imposed by Federal courts may seek release

and, similar to its State counterpart, it limits the grounds

therefor to instances where "the sentence was imposed in

violation of the Constitution or laws of the United States,"

where "the court was without jurisdiction to impose such

sentence," where "the sentence was in excess of the maximum

authorized by law," or where it "is otherwise subject to

collateral attack." 28 U.S.C. § 2255(a). The statute further

provides, in relevant part:

> **(b)** Unless the motion and the files and records of the case
> conclusively show that the prisoner is entitled to no
> relief, the court shall cause notice thereof to be served
> upon the United States attorney, grant a prompt hearing
> thereon, determine the issues and make findings of fact and
> conclusions of law with respect thereto. If the court

finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

**(c)** A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

> …

**(e)** An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

**(f)** A 1-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –

> **(1)** the date on which the judgment of conviction becomes final;
>
> **(2)** the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> **(3)** the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> **(4)** the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.
>
> …

As the foregoing language suggests, while § 2255 is comprehensive, "it does not encompass all claimed errors in conviction and sentencing, and an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice,'" or "is an omission inconsistent with the rudimentary demands of fair procedure." Addonizio, supra.; Hill v. United States, 368 U.S. 424, 428, 82 S. Ct. 468, 7 L. Ed.2d 417 (1961); Diggs v. United States, 740 F.2d 239, 242-243 (3d Cir. 1984).

In this manner, "unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack [remains] far more limited." Addonizio, id. And, a district court must only hold a hearing if the petitioner has alleged facts that, if proved, would entitle him or her to relief and an evidentiary hearing is necessary to establish the truth of those allegations. Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991)(citing, Smith v. Freeman, 892 F.2d 331, 338 (3d Cir. 1989) cert. denied, 502 U.S. 902, 112 S. Ct. 280, 116 L. Ed.2d 232 (1991). Mere bald assertions and conclusory allegations do not provide sufficient grounds to warrant requiring the state to respond to discovery or to require an evidentiary hearing. Id., (citing Mayberry v. Petsock, 821 F.2d

11

179, 185 (3d Cir. 1987)).  Similarly, an error that may justify
reversal on direct appeal will not necessarily support a
collateral attack on a final judgment.  <u>Addonizio</u>, 442 U.S. at
184.

## **Discussion**

Defendant makes several arguments in support of the within
motion, any and/or all of which he contend warrant setting aside
his sentences.  They are as follows:

(1) That his defense attorneys at trial failed to provide
him with the effective assistance of counsel required by
the 6th Amendment because they:

(a) failed to conduct an adequate pretrial
investigation by retaining a cell site expert;

(b) failed to conduct any pretrial investigation to
locate and interview potential witnesses concerning
the murders of Chineta Glanville and Dane King;

(c) failed to challenge the Government's failure to
disclose all of its cooperating witnesses' plea
agreements, thereby enabling the Government's
witnesses to falsely testify that the Government had
not made them any promises;

(d) failed to raise a challenge on double jeopardy
grounds with respect to the jury's guilty verdict on
both Counts I and II (Conspiracy and Continuing
Criminal Enterprise) as Conspiracy is a lesser
included offense of Continuing Criminal Enterprise.

(2) That Defense counsel Steven Turano rendered ineffective
assistance of counsel by failing to disclose that he had a
purported conflict of interest insofar as he deferred part
of his defense at trial to appointed counsel Jean Barrett
but kept the fees paid by Defendant for retention of expert
witnesses and a private investigator for himself.

(3) That the Government never disclosed that photographs
were seized during the execution of the search warrant of
Defendant's residence and failed to make those photographs
available to the defense for inspection and/or use during
trial.

Although habeas corpus petitions prepared by a prisoner without legal assistance may not be skillfully drawn and should thus be read generously,[4] even in applying this principle it is clear from Defendant's motion and the files and records of the case that he is entitled to no relief. Accordingly, there is no need for a hearing in this matter and we shall proceed to adjudicate Defendant's motion based upon the materials already of record.

*Ineffective Assistance of Counsel*

As is evident, the gist of Defendant's asserted grounds for § 2255 relief involve the allegedly ineffective assistance rendered by his defense attorneys in the course of preparing for and during the trial of this case.

The standards for adjudicating ineffective assistance of counsel claims have been well and firmly established since 1984 when the U.S. Supreme Court decided Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). Noting that the Constitution guarantees a fair trial through the Due Process Clauses but defines the basic elements largely through

---

[4] United States v. Santarelli, 929 F.3d 95, 103 (3d Cir. 2019)(citing Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010)).

the several provisions of the Sixth Amendment including the
counsel clause, the Court in Strickland began its analysis by
observing:

> … [A] fair trial is one in which evidence subject to
> adversarial testing is presented to an impartial tribunal
> for resolution of issues defined in advance of the
> proceeding. The right to counsel plays a crucial role in
> the adversarial system embodied in the Sixth Amendment,
> since access to counsel's skill and knowledge is necessary
> to accord defendants the 'ample opportunity to meet the
> case of the prosecution' to which they are entitled.

Strickland, 466 U.S. at 685, 104 S. Ct. at 2063 (quoting Adams
v. United States ex rel. McCann, 317 U.S. 269, 275, 276 (1942)).
Consequently, "the right to counsel is the right to the
effective assistance of counsel" and "[c]ounsel … can … deprive
a defendant of the right to effective assistance, simply by
failing to render 'adequate legal assistance.'"  Strickland, 466
U.S. at 686 (quoting Cuyler v. Sullivan, 446 U.S. 335, 344, 100
S. Ct. 1708, 64 L. Ed.2d 333 (1980) and McMann v. Richardson,
397 U.S. 759, 771, n. 14, 90 S. Ct. 1441, 25 L. Ed.2d 763
(1970)).  "The benchmark for judging any claim of
ineffectiveness must be whether counsel's conduct so undermined
the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result."  Id.

The Strickland decision went on to set forth a two-part
test for evaluating claims of denial of the Sixth Amendment
right to effective assistance of counsel.  Gov't of Virgin

Islands v. Vanterpool, 767 F.3d 157, 165 (3d Cir. 2014).

"First, the defendant must show that counsel's performance was
deficient," which "requires showing that counsel made errors so
serious" that he or she "was not functioning as the 'counsel'
guaranteed the defendant by the Sixth Amendment," (*i.e.,* that
the "representation fell below an objective standard of
reasonableness"). Strickland, 466 U.S. at 687, 688, 104 S. Ct.
at 2064; Vanterpool, supra. This first prong "is necessarily
linked to the practice and expectations of the legal community:
[t]he proper measure of attorney performance remains simply
reasonableness under prevailing professional norms." Padilla v.
Kentucky, 559 U.S. 356, 366, 130 S. Ct. 1473, 1482, 176 L. Ed.2d
284 (2010)(quoting Strickland, 466 U.S. at 688).

   "Second, the defendant must show that the deficient
performance prejudiced the defense." Strickland, 466 U.S. at
687. This requires showing that counsel's errors were so
serious as to deprive the defendant of a fair trial, a trial
whose result is reliable." Id. In analyzing this component,
courts must "ask whether there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the
proceeding would have been different." Padilla, supra,(quoting
Strickland, 466 U.S. at 688). "A reasonable probability is a
probability sufficient to undermine confidence in the outcome."

Workman v. Superintendent Albion SCI, 915 F.3d 928, 944(3d Cir. 2019)(quoting Roe v. Flores-Ortega, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed.2d 985 (2000)); This requires a substantial, not just a conceivable likelihood of a different result.  Shinn v. Kayer, ___ U.S. ___, 141 S. Ct. 517, 523, 208 L. Ed.2d 353 (2020); Cullen v. Pinholster, 563 U.S. 170, 189, 131 S. Ct. 1388, 1403, 179 L. Ed.2d 557 (2011); Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed.2d 624 (2011).  Through it all, "[j]udicial scrutiny of counsel's performance must be highly deferential … such that "every effort be made to eliminate the distorting effects of hindsight…and to evaluate the conduct of counsel's performance from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

Additionally, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and thus "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  Id. "Ultimately, the relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Workman, 915 F.3d at 943(quoting Strickland, 466 U.S. at 694).

In applying these legal maxims to each of the ineffectiveness arguments raised in the defendant's motion here, we can find no merit in any of them.  First, as to the contentions that defense counsel was ineffective for failing to adequately retain a cell site expert and that Attorney Turano in particular rendered ineffective assistance in allegedly keeping for himself fees paid by Defendant for retention of experts and investigators[5], as the affidavit of Calli Keep, the Supervisor of Corporate Security for Defendant's cell phone provider Sprint, attests, unless Defense counsel requested retention of Defendant's cell phone records within a period of no later than 18 months, those records were automatically purged from the

_____

[5] Defendant has also claimed that his counsel "had an actual conflict of interest wherein he violated his fiduciary duties" … "as he was provided ample funds for consulting and/or retaining such experts in lieu of which Counsel simply pocketed those funds for his own use."  (Def's Amended Motion to Vacate, Set Aside or Correct Sentence and Memorandum of Points and Authorities in Support, Doc. No. 1061, p.9).  While it is true that "defense counsel have an ethical obligation to avoid conflicting representations and to promptly advise the court if and when a conflict of interest arises during the course of a trial" [See, Cuyler v. Sullivan, 446 U.S. 335, 346, 100 S. Ct. 1708, 64 L. Ed.2d 333 (1980)], this typically arises when a defense attorney has the duty of representing more than one defendant at a trial or previously represented a victim of the defendant then being tried.  See, e.g., Mickens v. Taylor, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed.2d 291 (2002); Wood v. Georgia, 450 U.S. 261, 101 S. Ct. 1097, 67 L. Ed.2d 220 (1981).  In this case, there is nothing to suggest that any of Defendant's attorneys at any time represented any of the other defendants or previously represented any of the victims in this action. While it is also true that "competition between the client's interests and counsel's own interests plainly threatens" the duty of "[u]ndivided allegiance and faithful, devoted service to a client," Defendant fails to allege or show how Attorney Turano's purported keeping of advanced expenses resulted in a breach of his ethical obligations to his client such that there was a substantial likelihood that Defendant would have been acquitted had he not done so.

company's database.[6]  See: Exhibit 3 to Government's Response in Opposition to Defendant's § 2255 Motion (Doc. No. 1054-3). Inasmuch as the Indictment did not issue, Defendant was not arrested and Defense counsel were not retained until September 2007, it is obvious that Defendant's cell phone records from 2002 no longer existed and hence there was no basis upon which to retain a cell site expert. Even if such records could still have been in existence and even giving credence to Defendant's assertion that the account records may not have been purged after five years, the Strickland standard demands more than pure speculation – it "requires showing that counsel made errors so serious" that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and it requires a showing of a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Padilla, supra; Strickland, 466 U.S. at 688.  Stated otherwise, "the Strickland standard is 'highly demanding' such that there must be a "substantial, not just a conceivable likelihood of a different result."  Shinn v.

_____

[6] Defendant claims that the location of his cell phone is relevant because of Bryant Phillips' testimony that he and Defendant "scouted" the area of Glanville's home on the day before the murders during the course of which Defendant made several calls on his cell phone.  Although his argument is less than clear, Defendant presumably is claiming that if a cell site expert had been consulted and the records obtained, Defense counsel could have presented evidence that Defendant's cell phone was elsewhere on that date and this evidence could have been used to impeach Bryant Phillips' testimony that he murdered Glanville and King at Defendant's behest.

18

Kayer, supra (quoting Pinholster, 563 U.S. at 189 and Kimmelman v. Morrison, 477 U.S. 365, 382, 106 S. Ct. 2574, 91 L. Ed.2d 305 (1986)). Given the virtual certainty that a cell site location expert would have no records to review, together with the distinct possibility that even if the records were available they would have shown that Defendant was in fact exactly where his cousin testified he was on the day preceding the murders, there simply is no basis to find that defense counsel in this matter acted unprofessionally in not retaining a cell site/location expert or that the results of Defendant's trial would have been in any way different. Indeed, the evidence of Defendant's guilt which was amassed and presented at trial was overwhelming. Accordingly, there are no grounds for § 2255 relief for defense counsel's failure to expend funds advanced for, or to consult with or retain a cell location expert.

Defendant's next claim that counsel rendered ineffective assistance by not conducting any pretrial investigation to locate and interview potential witnesses concerning the murders of Chineta Glanville and Dane King also fails. On this point, Defendant asserts that he informed his attorneys that records from Curran-Fromhold Correctional Center in Philadelphia would show that he and Chanel Cunningham arrived there at 1:16 p.m. (presumably on the day before the Glanville and King murders) to

visit Lamont Smith and left at 2:22 p.m. so it would have been impossible for him to be on a scouting trip of Glanville's home with Bryant Phillips at the time that Bryant testified. Defendant claims that defense counsel's failure to travel the scouting trip route to ascertain the timing and to search for possible witnesses who may have seen Bryant Phillips and Defendant together rendered their counsel ineffective.  (Def's Pro Se Motion Requesting Permission to Extend the Page Limit, Doc. No. 1046, pp. 35-36).

    As the Strickland court counseled: "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691, 104 S. Ct. at 2066. Here, it is difficult to comprehend how travelling the scouting trip route would have produced any evidence that would have been helpful to the defense.  The likelihood of finding any witnesses who may have seen or remember seeing Defendant and his cousin together on June 24, 2002 by the time defense counsel were retained in late 2007 is virtually non-existent.[7]  Likewise, even

---

[7] This differs greatly from cases where counsel neglects to search for and interview witnesses whose identities or some other identifying characteristics are provided to counsel.  Defendant is literally asking that his counsel be held ineffective for failing to search for the proverbial "needle in the haystack."

giving Defendant the benefit of every doubt that the Curran-
Fromhold visitor's records were still in existence at the time
of trial in 2010 and that they showed that Defendant and
Cunningham had visited Smith in the early afternoon hours of
June 24, 2002, it still remains entirely plausible that
Defendant and his cousin subsequently "scouted" the Glanville
home, which was located less than fifteen miles away, a short
time later.  We thus find that defense counsel's decision to not
expend funds, time or energy to locate such possible witnesses
or to find and/or review the Curran-Fromhold visitors' log was
eminently reasonable.  There are no grounds for § 2255 relief on
the basis of these arguments either.

Defendant next contends that he had also informed his
attorneys that a photograph existed showing Bryant Phillips on
the same street near Glanville's home and that "[t]his would
have supported the defense theory that Bryant Phillips had cased
out the Glanville home prior to returning there to rob her, on
the day that he murdered her and her godson, Dane King," and
could have been used to impeach Bryant Phillips' trial
testimony. (Def's Pro Se Motion Requesting Permission to Extend
the Page Limit, Doc. No. 1046, pp. 35-36).  From there,
Defendant argues that the Government never disclosed that it
seized photographs during the execution of the search warrant of

Defendant's residence but failed to make those photographs available to the defense for inspection and/or use during trial. It is his counsel's purported failure to seek the production of the photo of Bryant on Glanville's street that allegedly rendered their assistance ineffective.

Again, we find this argument to be nothing more than pure speculation which fails to meet Strickland's demanding standards. As FBI Supervisory Special Agent Kathy Downs attests in her Affidavit, attached as Exhibit 4 to the Government's response to Defendant's § 2255 Motion, the only photographs seized in the course of the search of Defendant's home were from his automobile which was located outside the residence and which only reflected depictions of various women. Agent Downs, together with the lead prosecutor in the case, reviewed all of the photographs in the Government's possession in this matter and none of them contained a likeness of Bryant Phillips. Defense counsel is not ineffective in failing to search for a photograph that in all probability does not and never did exist.

Defendant's next claim of attorney error – that his defense attorneys failed to provide him with effective assistance insofar as they did not challenge the Government's alleged failure to disclose all of its cooperating witnesses' plea agreements and thereby enabled the Government's witnesses to

falsely testify that the Government had not made them any promises, is similarly unavailing. In short, the record reveals that there is absolutely no truth to these assertions.

Attached to the Government's response to Defendant's §2255 motion as Exhibit 1 is a copy of a letter dated January 4, 2010 from the lead prosecutor to Defendant's attorneys and the attorneys of the other remaining defendants enclosing paper copies of the guilty plea agreements of both Bryant Phillips and Lamont Smith and a disk containing the criminal histories of some 32 Government witnesses and the guilty plea agreements of Marco Camacho, Chanel Cunningham, Mark Harris, Tyrece Lawrence, Samuel McQueen, Theophus Orr, Ramon Alvear, and Sherman Kemp. The record in this matter further reflects that each of these witnesses was thoroughly questioned by defense counsel about their agreements with the Government, about their own participation in the events underlying the charges in this case, their criminal histories and whether any promises had been made to them by the prosecuting authorities in exchange for their testimony.[8]  Thus, inasmuch as the record here clearly refutes

---

[8] The full record/trial transcript citations to the cross-examinations of Chanel Cunningham, Bryant Phillips, Ramon Alvear, Mark Harris, Kenneth Jenkins, M.B. Terrell, Terry Smith, Lamont Smith, Marco Camacho, Theophus Orr, and Ronald Copper may be found on page 28, footnote 20 of the Government's Opposition to Defendant Phillips Motion Pursuant to 28 U.S.C. Section 2255 to Vacate, Set Aside or Correct Sentence By a Person in Federal Custody, Doc. No. 1054.

Defendant's allegations, there is no foundation upon which to vacate, set aside or correct Defendant's sentence on the grounds that defense counsel failed to provide Defendant the representation required by the Sixth Amendment.

Defendant's final claim is that his attorneys' representation was ineffective because they failed to raise a challenge on double jeopardy grounds with respect to the jury's guilty verdict on both Counts I and II (Conspiracy and Continuing Criminal Enterprise) because Conspiracy is a lesser included offense of Continuing Criminal Enterprise.

The issue of the propriety of Defendant's conviction and sentencing on both the Drug Conspiracy and Continuing Criminal Enterprise ("CCE") charges was previously considered and addressed by the U.S. Court of Appeals for the Third Circuit on direct appeal in 2014. Because there was no objection at trial and this issue was raised for the first time on direct appeal, the Third Circuit employed a plain error analysis in conducting its review.[9] Given that the Government had conceded that both of the convictions for CCE and Conspiracy could not stand under the holding of Rutledge v. United States, 517 U.S. 292, 116 S. Ct.

---

[9] "Error is plain if it is clear or obvious under current law or so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." Vanterpool, 767 F.3d at 162(quoting United States v. Gore, 154 F.3d 34, 42-43 (2d Cir. 1998)).

1241, 134 L. Ed.2d 419 (1996) because drug conspiracy is a lesser included offense of CCE, the Third Circuit accepted the Government's proposal to dismiss the CCE conviction. United States v. Phillips, No. 10-3706, 589 Fed. Appx. 64, 2014 U.S. App. LEXIS 19795, 2014 WL 5286111 (3d Cir. Oct. 16, 2014), *cert, denied,* 576 U.S. 1064, 134 S. Ct. 2911, 192 L. Ed.2d 941 (June 29, 2015). Accordingly, any prejudice or harm which Defendant incurred as the result of his counsel's failure to object to his having been convicted and sentenced on both of these charges has already been ameliorated by the dismissal of the CCE conviction. He is not entitled to any further relief on this basis.

## Conclusion

For all of the reasons outlined above, Defendant's Motion (as amended) to Vacate, Set Aside and/or Correct his Sentence Pursuant to 28 U.S.C. Section 2255 is denied in its entirety.

An Order follows.